UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                                )
                                      )
    GREGG SAMUEL GIORDANO             )    Case No. 10-12456-SSM
                                      )    Chapter 11
             Debtor                   )

**MEMORANDUM OPINION**

Before the court is the motion of the debtor in possession to reject a fee sharing agreement with Data Mountain Solutions, Inc. ("DMS") and Derek McUmber relating to a government contract between an entity known as Native Technologies, Inc. ("NTI") and the United States General Services Administration ("GSA").  Although the debtor disputes that the agreement even exists, an arbitrator found to the contrary and required the debtor to comply with it.  A hearing was held on August 13 and 27, 2010.  At the conclusion of the debtor's evidence, DMS and McUmber moved for judgment as a matter of law.  *See* Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(c).  The court granted the motion and now issues this opinion to memorialize, for the benefit of the parties and any reviewing court, the reasons for, and limits of, the ruling

Background

Gregg Samuel Giordano ("the debtor") filed a voluntary petition in this court on March 30, 2010, for reorganization under chapter 11 of the Bankruptcy Code and remains in possession of his estate as debtor in possession.  A plan has not yet been proposed.

The chapter 11 case was filed shortly after, and in response to, a judgment confirming an arbitration award determining the existence of the fee splitting agreement the debtor now seeks

to reject and directing the debtor to take specific remedial action. The events giving rise to both the arbitration and the present motion date back to late 2002, when the debtor became aware of a government contract opportunity and negotiated with NTI, which is minority owned, to be the prime contractor, with the actual work to be performed by the debtor and DMS, which the debtor had offered to bring on board in exchange for a one-third ownership interest in DMS. In January 2003, a document entitled "Teaming Agreement" was signed by the debtor and by Joseph F. Abbate, the president of NTI, under which NTI agreed to act as "prime offeror"—for which it would receive 5% of the contract revenues—and "Wave Interface/Data Mountain Solutions, Inc." would act as "sole subcontractor." Wave Interface had been a limited liability company in which the debtor had been an investor, but the company had been dissolved prior to the signing of the Teaming Agreement. The debtor testified, however, that he continued to use its name as a trade name in connection with his activities as an independent contractor. Attached to the Teaming Agreement is a two paragraph exhibit, entitled "Subcontractor Document," which states, pretty much in its entirety, as follows:

> NTI will perform Program Management for 5% - Responsibilities including maintaining NTI date [*sic*] in contractor database, filing necessary corporate information with the GSA to ensure payment and processing, submission of invoices in a timely manner, and payment of sub-within [*sic*] 3 days after receipt of payment.
>
> Gregg Giordano will perform Project Management 47.5% - Responsibilities include performing all day-to-day contract administrative duties and provide and maintain all data necessary for NTI to perform billing function. And Wave/DMS will perform Technical services for 47.5% - Responsibilities include design build and maintain all software, hardware and network technology necessary for to [*sic*] support the GSA contract.

Debtor Exh. A, p. 4. The GSA contract was awarded to NTI and had three phases, which the parties have referred to as Blue Pages I, Blue Pages II, and dotGov.

At the time the Teaming Agreement was signed, the debtor was not yet a shareholder, officer, or director of DMS.  DMS had been started by two individuals, Anthony ("Tony") Watson and Frederick S. ("Fred") Hill.  Shortly after work commenced on Blue Pages I in March 2003, Derek McUmber was brought on board.  He had been a sales representative for a company known was WebPutty, Inc., which marketed a software product of the same name.  DMS had been licensed to use the software and was the beneficiary of an escrow agreement for the source code.  After WebPutty filed for bankruptcy, DMS obtained the source code from escrow and, at the debtor's encouragement, offered McUmber, because of his familiarity with the product, an ownership interest in DMS.  In June 2003, the debtor and McUmber each became approximately 25% shareholders in DMS.

From June 2003 until June or July 2006, the debtor would submit three invoices to NTI each month with respect to the GSA contract: one for DMS, one for himself, and one for McUmber, with the dollar amounts representing 49%, 23%, and 23%, respectively of the contract revenues for that month.  The debtor testified that the payment to DMS included an additional 1.5% over the 47.5% contemplated in the "subcontract" document because he wanted to provide DMS with additional funding to cover its expenses.  He further testified that, in his mind, the 23% being paid to McUmber was voluntarily coming out of his (the debtor's) share under the teaming agreement, since DMS did not have sufficient income at that time to pay McUmber a salary.  He testified that he directed NTI to make the payment directly to McUmber rather than to himself for further payment to McUmber to avoid having to issue his own IRS Form 1099 tax statement to McUmber.

In June 2006, a contentious board of directors meeting was held to address a number of issues, including payment of a $40,000 bonus to the debtor which the debtor planned to use to purchase Tony Watson's stock. McUmber objected, and relationships among the parties quickly deteriorated, ultimately resulting in litigation, followed by arbitration, to resolve disputes under the DMS shareholder agreement. The debtor arranged for NTI to stop making pavements altogether to McUmber, increased the payment to himself from 23% to 47½ %, and reduced the payments to DMS from 49% to 47½%. Even that sum was withheld from DMS for several months, with the debtor holding the checks, and then depositing them into an account he had opened in DMS's name but over which only he had signature authority.

The arbitration resolved a number of disputes among the DMS shareholders, including division of fees earned with respect to the GSA contract. Specifically, the arbitrator found "that a contract exists among DMS, Giordano and McUmber as to the (a) services to be performed by each to NTI and to GSA for the purpose of fulfilling NTI's contractual obligations to GSA and (b) division of fees among then and NTI arising from the GSA-NTI contract (the 'GSA-NTI Fee Sharing Agreement')." The arbitrator further found that under the agreement, DMS, the debtor, and McUmber were entitled to receive 49%, 23%, and 23%, respectively, of the revenues received by NTI from the GSA contracts. The arbitrator determined that the debtor, by directing payment to himself of funds to which DMS and McUmber were entitled, owed DMS $166,957 plus interest and McUmber $120,083 plus interest. The arbitrator directed payment of those sums within 30 days, in default of which the debtor was to

> take all necessary steps to ensure that, the GSA-NTI contract proceeds payable to DMS, Giordano and McUmber . . . are paid out entirely to DMS and McUmber in the respective percentages of 64% and 31% until such overpayment is cured and DMS and McUmber are made whole.

Debtor Ex. A, ¶ 9. Finally, the debtor was directed to

> take all necessary steps in his capacity as a director and shareholder of DMS to ensure that all future proceeds from the GSA-NTI contracts under the Teaming Agreement (other than the 5% to be paid to NTI) are divided among DMS (49%), Giordano (23%) and McUmber (23%) in accordance with the GSA-NTI Fee Sharing Agreement.

*Id.* The final award of the arbitrator is dated November 14, 2008, and was confirmed over the debtor's objection by the United States District Court for the District of Columbia on January 15, 2010.

## Discussion

### A.

Section 365 of the Bankruptcy Code allows a trustee or chapter 11 debtor in possession,[1] with court approval, to assume or reject any executory contract or unexpired lease. The phrase "executory contract" is not defined in the Bankruptcy Code, but the Supreme Court has observed that Congress intended the term to apply to contracts "on which performance remains due to some extent on both sides." *National Labor Relations Board v. Bildisco and Bildisco,* 465 U.S. 513, 522–23 n.6, 104 S.Ct. 1188, 1194 n.6, 79 L.Ed.2d 482 (1984) (quoting H.R. Rep. No. 95-595 (1978)). Most courts, including the Fourth Circuit, have expanded upon this somewhat general formulation by adopting the test first articulated by Professor Vern Countryman in a celebrated law review article. Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973); *Gloria Mfg. Corp. v. Int'l Ladies' Garment Workers' Union,* 734

---

[1] Under § 1101 of the Bankruptcy Code, the debtor in possession is the debtor in any chapter 11 case in which no trustee is serving. Section 1107 provides that "[s]ubject to . . . such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights . . . and powers" of a trustee other than the right to compensation.

F.2d 1020, 1021-22 (4th Cir. 1984) (stating that Congress, in enacting §365(a), had ratified the Countryman test). Professor Countryman defined an executory contract as one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." This definition by its very terms requires mutuality with respect to the remaining obligations of the parties. The test seeks to ensure that the trustee's right to assume or reject is "an option to be exercised when it will benefit the estate," and that the right does "not extend to situations where the only effect of its exercise would be to prejudice other creditors of the estate." *Gloria Mfg.,* 734 F.2d at 1022 (quoting Prof. Countryman).

A useful way of thinking of an executory contract is that it is an asset coupled with a liability. If a debtor has an unperformed contract to deliver 1,000 widgets to a customer in exchange for $10,000, the asset is the right to the $10,000 payment, while the liability is the cost of supplying the widgets. If supplying the widgets would cost the trustee only $5,000, the trustee may assume, that is elect to perform, the contract in order to claim its benefit for the estate. Indeed, the trustee may do so even if the contract is in default, provided the defaults are promptly cured. §365(b)(1)(A), Bankruptcy Code. On the other hand, if performance would cost the trustee $15,000, there would be no benefit to the estate, and the trustee may reject, that is, elect not to perform, the contract. Of course, in doing so, the trustee waives any benefit under the contract that is dependant on performance. More fundamentally, rejection is not cost-free. Rejection is not a species of avoidance—it does not make the contract disappear. Rather, rejection constitutes a breach of the contract and gives the counter-party a claim for damages

resulting from the failure to perform.  However, the breach is treated as having occurred prepetition, with the result that the creditor simply shares pro rata with other unsecured creditors.

Importantly, a trustee or debtor in possession cannot assume only the favorable part of a contract and reject the rest—the contract must be assumed or rejected as a whole.  *U.S. Dept. of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1472 (4th Cir. 1990).  The difficulty in this case is that the fee sharing agreement is really not a stand-alone contract but is intertwined with the underlying contractual relationships among DMS, the debtor, NTI, and GSA.  In particular, what is lacking is mutuality of obligations.  This is not a situation in which DMS and McUmber are sub-contractors to the debtor or he to them.  DMS and McUmber owe no duties to Giordano; rather their duty of performance, like his, is to NTI.  If a subcontract relationship existed between the debtor on the one hand and DMS and McUmber on the other, the debtor could, in the exercise of appropriate business judgment, simply refuse performance and waive the benefit of the subcontract.  But the debtor does not propose to walk away from his contractual duties to NTI, which in any event is not a party to the fee sharing agreement.  On the contrary, his testimony is that he, DMS, and McUmber would continue performing as they have all along, except that the revenues, instead of being split among themselves in accordance with the agreement found by the arbitrator, would be split 47½% to him, 47½% to DMS, and nothing directly to McUmber.  Effectively, the debtor seeks not to reject a burdensome contractual relationship but to rewrite a piece of it.  Section 365 does not allow him to do so.

B.

But there is another reason why, even if the fee sharing agreement were otherwise an executory contract, rejection would not be permitted.  Many courts have held that once a court

decrees specific performance of a contract, the contract is no longer executory and cannot be rejected. A line of cases holds that once a court has decreed specific performance, a contract for the sale of real estate is no longer executory. *See, e.g., Sundial Asphalt Co. v. V.P.C. Investors Corp. (In re Sundial Asphalt Co.),* 147 B.R. 72, 80 (E.D. N.Y. 1992); *In re Roxse Homes, Inc.* 74 B.R. 810, 816-18 (Bankr. D. Mass. 1987), *aff'd sub nom. Roxse Homes, Inc. v. Roxse Homes, L.P.*, 83 B.R. 185 (D. Mass. 1988), *aff'd* 800 F.2d 1072 (1st Cir. 1988). The court sees no reason why the same result would not obtain with respect to other types of contracts. In this case, the arbitrator not only determined the existence of the agreement and awarded damages for its past breach, but specifically required that future revenues received from NTI under the GSA contract be split in accordance with the agreement. The latter portion of the award, at least from the date of the District Court judgment confirming it, effectively constituted a decree of specific performance, thereby precluding the debtor in possessing from simply electing not to comply.

C.

It is worthwhile emphasizing that the narrow issue before the court is whether or not the free-sharing agreement may be rejected. In particular, the court makes no ruling at this time as to the enforceability, as against the estate, of that portion of the arbitrator's award requiring future contract revenues (other than the 5% belonging to NTI) be paid to DMS and McUmber until the damage award is satisfied. In connection with a separate motion for relief from the automatic stay, the court has required the escrow of sums received by the debtor post-petition in excess of the 23% permitted under the arbitration award, and any determination of entitlement to those funds, as well as what type of claim DMS and McUmber have for payments, both

prepetition and post-petition, received by the debtor, will be the subject of further hearings in this case.

A separate order will be entered denying the motion to reject the fee sharing agreement.

Date: _____              _____
                                           Stephen S. Mitchell
Alexandria, Virginia                       United States Bankruptcy Judge


Copies to:

Christopher L. Rogan, Esquire
RoganLawFirm, PLLC
30-D Catoctin Circle, SE
Leesburg, VA  20175
Counsel for the debtor in possession

Dawn C. Stewart, Esquire
The Stewart Law Firm, PLLC
1050 Connecticut Avenue, NW
Tenth Floor
Washington, DC  20036
Counsel for Data Mountain Solutions, Inc. and Derek McUmber

Office of the United States Trustee
115 South Union Street, Suite 210
Alexandria, VA  22314